**U.S. ex rel. Allen LAMERS, Plaintiff,**

**v.**

**CITY OF GREEN BAY, Defendant.**

**No. 95–C–684.**

United States District Court,
E.D. Wisconsin.

March 13, 1998.

Robert Parent, Roels, Keidatz & Parent, DePere, WI, Steven D. Gordon, Leslie S. Spitalney, Holland & Knight, Steven A. Diaz, Dykema Gossett, Washington, DC, for Plaintiff Lamers.

Jerry H. Hanson, Green Bay City Law Dept., Green Bay, WI, Edward J. Gill, Willis A. Siegfried, Ross A. Keene, Eckert, Seamans, Cherin & Mellott, Washington, DC, for Defendant.

William J. Lipscomb, U.S. Department of Justice, Milwaukee, WI, Benjamin J. Vernia, Michael F. Hertz, Stephen D. Altman, U.S. Department of Justice, Washington, DC, for U.S.

### *DECISION AND ORDER*

ADELMAN, District Judge.

Relator Allen Lamers, an officer of Lamers Bus Lines, Inc. ("Lamers"), brings this action on behalf of the United States pursuant to the *qui tam* provision of the False Claims Act, 31 U.S.C. § 3730(b). Lamers alleges that the City of Green Bay ("City"), which owns and operates Green Bay Transit ("GBT"), made false statements and representations to the Federal Transit Administration ("FTA") in order to obtain annual FTA grant funds and to avoid repayment of improperly received grant funds in violation of 31 U.S.C. § 3729(a)(2) and (7). According to Lamers, GBT and City officials falsely represented the nature of the City's provision of bus service to local school children and the extent of GBT's compliance with applicable FTA regulations.

Count I of this action, brought under 31 U.S.C. § 3729(a)(2), alleges that the City intentionally conceived and instituted a plan to bus Green Bay school children which did not comport with federal requirements, all the while falsely maintaining to FTA officials that GBT was in complete or substantial regulatory compliance. On the basis of these false assurances, Lamers argues, the FTA erroneously forwarded grant money to the City in 1993, 1994, and 1995 to subsidize GBT operations. Count II of this action alleges that the same false assurances were also made to guard against the possibility of having to refund this fraudulently obtained mon-

ey, thus constituting a set of distinct "reverse false claims" under 31 U.S.C. § 3729(a)(7).

The United States has declined to exercise its option to intervene in this action pursuant to 31 U.S.C. § 3730(b)(4)(B). Allen Lamers continues to litigate these claims as the Relator, as is his right under the *qui tam* framework of the False Claims Act. Presently before the Court are two motions: the City moves to dismiss for lack of subject matter jurisdiction and for summary judgment on the merits.

## I.

### FACTUAL BACKGROUND

In September, 1992, the Green Bay Area Public School District ("District") contacted GBT about the possibility of transporting children to and from school on the City's public transit system. Prior to that, school bus transportation in the Green Bay area had been primarily the province of private operators such as Lamers Bus Lines. Lamers itself claims to have bused Green Bay school kids since 1959 under successive, uninterrupted contracts with the District. Information submitted by both parties suggests that the District's chief motivation in exploring public transit for its busing needs was financial: one internal District memorandum comparing private and public carriers projected an annual savings of approximately $33,000 from using the city transit system. (Pl.'s App. Ex. 11 at 4.) By February, 1993, GBT had submitted its initial proposal for public student transport to the District, calling it a "pilot program."

On March 22, 1993, the City submitted an application for transit operating assistance to the FTA, as it would again in the spring of 1994 and 1995. As part of the annual application process, the City must submit certifications and assurances to the FTA indicating GBT's compliance with various federal statutes and regulations connected to the federal assistance programs. FTA grant procedure provides for the one-time submission of basic project assurances by all applicants for transit funding. In this scheme, assurances required under various federal transportation programs are consolidated into a single, com-

prehensive standard assurance which can be submitted once and referred to in all future applications for transit assistance. The City had executed its original "Standard Assurances" in 1989 under the Urban Mass Transportation Act of 1964, the predecessor to the current federal mass transportation statute, 49 U.S.C. Chapter 53. The 1989 Assurances, signed by then-mayor Samuel Halloin, stated generally that the City "will comply with all Federal statutes, regulations, Executive orders and administrative requirements applicable to [federal transit funding]." (Def.App.Ex. 3.) Following agency procedure, the City submitted along with its 1993 application for transit assistance a "Statement of Continued Validity of One-time Submissions," certifying that the City's 1989 Standard Assurances remained valid and accurate. This general promise of regulatory compliance, renewed and incorporated by reference in 1993, 1994, and 1995, constitutes a significant part of what Lamers alleges are the City's false statements and claims.

Like other eligible public entities, the City receives mass transit funding from the FTA pursuant to 49 U.S.C. Chapter 53. Specifically at issue here, 49 U.S.C. § 5323(f) permits federal financial assistance for the use of mass transit equipment to provide school bus service, but requires that "the applicant agrees not to provide schoolbus transportation that exclusively transports students and school personnel in competition with a private schoolbus operator." The Department of Transportation's implementing regulations are found at 49 C.F.R. Part 605—*School Bus Operations*. Most pertinent, 49 C.F.R. § 605.3 defines the bounds of permissible "tripper service," which is the type of schoolbus service GBT purports to have provided at all times relevant to this action.

While GBT's 1993 application for transit assistance was still pending, Lamers' School Operations Manager Byron Kruschke lodged an informal complaint with the FTA about GBT's proposed pilot program. In a letter dated June 10, 1993, Kruschke questioned GBT's right under applicable regulations to provide what he characterized as "direct service to and from the schools." (Def.'s App. Ex. 22.) Kruschke noted that GBT's pro-

posed routes were not consistent with current bus routes but appeared to be separate, newly designed routes. According to Kruschke, this was a violation of 49 C.F.R., Part 605. (*Id.*) The FTA forwarded Kruschke's complaint to GBT Transit Director Gary Gretzinger, who responded by letter of June 30, 1993. Gretzinger characterized the proposed service as "an extension of regular routes and utilizing an extra bus, if ridership demands, to avoid overloading." (Def.App.Ex. 25.) Gretzinger also stated that "[a]ll proposed service will be advertised, open to the public and stop at all designated Green Bay Transit bus stops." (*Id.*)

FTA Regional Administrator Joel Ettinger provided the agency's official response to Lamers' informal complaint by letter to Kruschke dated August 24, 1993. Ettinger clearly stated the FTA's belief that GBT's proposed service was properly considered "tripper service" and was therefore in compliance with FTA regulations:

> Both the FTA Act, and the FTA's school bus regulations as set forth at 49 C.F.R. Part 605, permit recipients of FTA assistance to accommodate the needs of school students together with the general public as part of its mass transportation service. FTA has designated this type of service to be "tripper service" as distinguished from "school bus operations."

(Def.'s App. Ex. 26.) Ettinger then included the complete definition of "tripper service," which remains central to our discussion today:

> *Tripper service* means regularly scheduled mass transportation service which is open to the public, and which is designed or modified to accommodate the needs of school students and personnel, using various fare collection or subsidy systems. Buses used in tripper service must be clearly marked as open to the public and may not carry designations such as "school bus" or "school special". These buses may stop only at grantee or operator's regular service stop. All routes traveled by tripper buses must be within a grantee's or operator's regular route service as indicated in their published route schedules.

49 C.F.R. § 605.3(b). The tripper service definition, then, says nothing that would require public transit providers receiving FTA funds to design school bus routes only as extensions of existing routes.

With Ettinger's letter, the FTA closed its file on Lamers' 1993 complaint. Meanwhile, the FTA had approved the City's 1993 application for federal transit assistance and offered the City a standard FTA grant agreement on June 24, 1993, before Gretzinger made his initial response to Lamers' informal complaint. GBT commenced its pilot school bus service for the District in the latter half of August, 1993. The following March 25, 1994, the City submitted its 1994 application for federal transit assistance, which was approved on June 9, 1994.

On July 15, 1994, Lamers filed another, this-time-official administrative complaint with the FTA regarding GBT's pilot program service, which had just completed its first school year. The complaint alleged, in relevant part, that GBT was conducting prohibited school bus operations *not* permissible "tripper service," and that the City's continuing assertions to the contrary were erroneous and inaccurate. Once again, on August 12, 1994, Gretzinger wrote to the FTA responding to Lamers' complaint. He maintained that GBT's school bus service remained well within the bounds of permissible tripper service and denied all allegations as to violations of 49 C.F.R. Part 605. Over the next six months, Lamers submitted additional information to the FTA, including a videotape capturing allegedly non-compliant school bus service by the City.

On January 19, 1995, after an investigation which the FTA concedes was limited to a review of materials submitted by the parties, (Carter Dep. at 28), the agency issued an administrative Decision on the 1994 Lamers' complaint. The FTA found that GBT was, in fact, conducting prohibited school bus service in the following respects:

— GBT system maps did not show tripper route extensions and school deviations, thereby limiting public access to transit information;

— GBT's "any corner is a bus stop" policy was being inconsistently applied, thereby hindering public use of tripper routes; and

— GBT tripper buses were running express to route deviation points, without stopping at designated bus stops along the regular service route, thereby preventing public use of modified tripper routes.

(Def.'s App. Ex. 29 at 2–3.) The FTA Decision ordered GBT to "cease and desist" providing tripper service unless immediate action was taken to correct the above violations. The agency outlined three specific steps needed to come into compliance: (1) a revision of system maps to include route deviations; (2) the elimination of express runs to route deviation points; and (3) submission of a detailed service plan implementing these requirements to the FTA for approval. (*Id.* at 6.) The FTA also indicated its intention to continue to monitor the City's transit operations for compliance through unannounced site visits over the following year. Finally, the agency reserved the right to take further action, including barring the receipt of future FTA funds. (*Id.*)

After the Decision was issued, Gretzinger and the City Attorney's office began to communicate regularly with FTA regional counsel Dorval Carter about the substance of the FTA directives and GBT's efforts to comply. From February, 1995, through August, 1995, no fewer than ten letters about compliance issues were exchanged between Carter and either Gretzinger or Assistant City Attorney Judith Schmidt–Lehman. (Several of these letters will be discussed more fully below, as Lamers claims that specific representations within the letters to Carter were knowingly false and thus form another set of false statements at issue in this action.) Carter also attests to numerous phone conversations with Gretzinger and Schmidt–Lehman in those months, "during which we discussed the actions that the City and/or Green Bay Transit were taking and the progress towards achieving full compliance with the school bus decision." (Carter Ans. to Jt. Interrogs. at 13.)

Carter made an unannounced site visit to Green Bay on April 26 and 27, 1995, to observe GBT school bus operations first hand. Kruschke acted as a guide for Carter during the April visit, pointing out what Kruschke believed were persistent regulatory violations by GBT. Based on his own observations, Carter agreed that GBT continued to violate tripper rules in the following ways: (1) tripper route maps were not available at all designated service outlets; (2) tripper buses were "deadheading" between route deviation points, or going directly from one route to another without completing the first route; and (3) some drivers were picking up children in mid-block instead of at corners, as was the official GBT bus stop policy. (Carter Dep. at 49–54.) Carter met with Gretzinger on the second day of his visit, and the men discussed these new concerns about GBT tripper service and potential solutions. (*Id.* at 57–65.) In a follow-up letter on May 24, 1995, Carter asked for additional clarification of GBT's bus stop policy, the status of map revision and distribution efforts, and tripper route design.

Carter returned to Green Bay on June 1, 1995, to convene a meeting among City and GBT officials, the Green Bay Board of Education, and Lamers representatives to discuss GBT's tripper service. Carter pointed out areas of continuing non-compliance and again floated the possibility that the FTA would discontinue funding if total compliance was not ultimately achieved. (Def.'s App. Ex. 33.) No deadline was established or even suggested, however.

Meanwhile, in the midst of this dialogue with the FTA about compliance efforts, the City's 1995 application for transit operating assistance was submitted and approved. On March 6, 1995, as in previous years, the City's application was submitted along with a certification that the City's 1989 Standard Assurances remained valid and accurate. The FTA approved this latest application for federal assistance on June 8, 1995, just after Carter's June 1 meeting in Green Bay with interested parties. Thus, the record appears clear that approval of the City's grant application, at least in 1995, was granted despite the FTA's awareness that scrupulous compliance had yet to be achieved. (*See also* Carter Ans. to Jt. Interrogs. at 14.)

Over the course of the next year, the FTA continued its oversight of GBT tripper service, and the City and the agency maintained regular contact about GBT compliance efforts. As it happened, the City was due for its triennial review of public transit program performance, as required of block grant recipients pursuant to 49 U.S.C. § 5307(i)(2). In connection with this review, Carter made another site visit to Green Bay on September, 12, 1995, and observed tripper service operating in compliance with the FTA Decision. (Carter Dep. at 97.) The following February 9, 1996, the FTA issued a draft report of its FY 1995 Triennial Review Letter of Findings for the City's transit programs. The draft report concluded that the City had completed two of the three corrective actions called for in the 1995 Decision— route map revision and the elimination of express runs to route deviation points. (Def.'s App. Ex. 41 at 17.) The third action, submission of a comprehensive tripper service plan to the FTA for approval, was viewed as ongoing in light of GBT's decision to purchase and install new bus route markers and stop signs for the entire transit system. GBT was directed to continue to update the FTA regional office on the status of that project until its completion. (*Id.*) The FTA issued a substantially similar final version of its draft report in August, 1996, while GBT continued to provide regular progress reports on sign installation and other matters. Finally, on September 19, 1996, the FTA informed GBT that it was in complete compliance with the School Bus Protections provisions of the triennial review, as well as the 1995 FTA Decision. (Def.'s App. Ex. 45 at 2.)

## II.

### DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

#### A. *Qui Tam Actions Under the False Claims Act*

Lamers pursues its present claims against the City as a *qui tam* relator under the False Claims Act ("FCA" or "Act"), 31 U.S.C. §§ 3729–3733. The unique history and tangled policy goals behind the FCA's *qui tam* provision have been recited by numerous courts. *See, e.g., U.S. ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 679–81 (D.C.Cir.1997); *U.S. ex rel. Fine v. MK–Ferguson Co.,* 861 F.Supp. 1544, 1547–48 (D.N.M.1994). Intended as a weapon to ferret out fraud against the federal government, the FCA has made integral use of the *qui tam* concept since the Act's passage during the Civil War. The basic *qui tam* idea is that private citizens with personal knowledge of fraud against the government may bring suit on the government's behalf in return for a cut of the judgment proceeds should they prevail. Over the years, this simple idea has grown procedurally complex as courts and Congress have tried to navigate competing interests. Twice Congress has amended the jurisdictional prerequisites for *qui tam* relator status in response to especially troubling court decisions.

*U.S. ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), in which the Supreme Court permitted a *qui tam* suit based entirely on information culled from a fraud indictment, a public document, was typical of a growing tide of opportunistic lawsuits filed in the 1930s and 1940s. After *Marcus* broke the camel's back, Congress amended the FCA in 1943 to bar all *qui tam* suits based on information in the possession of the federal government. But another problem emerged after the 1943 amendments. By barring even those *qui tam* suits brought by individuals who themselves gave information of fraud to the government, Congress eliminated the financial incentive to come forward in the first place.

The Seventh Circuit's decision in *U.S. ex rel. Wisconsin v. Dean,* 729 F.2d 1100 (7th Cir.1984), illustrated the perverse logic of the 1943 version of the jurisdictional bar. In *Dean,* the State of Wisconsin was barred from acting as a *qui tam* plaintiff in an FCA suit alleging Medicaid fraud because the state had already disclosed the underlying fraud to the government, as required by statute. To make matters worse, the federal government had declined to intervene, leaving no proper plaintiff to pursue patently fraudulent conduct. Congress responded in

1986 by amending the jurisdictional hurdle to bar suits based on publicly disclosed information (rather than information possessed by the government) and to provide specific protection to "original source" plaintiffs. Thus, the 1986 version of the FCA tries to strike that elusive balance between discouraging opportunistic litigation and encouraging private citizens to come forward with knowledge of fraud.

The City's present motion to dismiss relies on the following provisions of the FCA jurisdictional bar, as amended in 1986:

> (4)(A) No court shall have jurisdiction over an action in this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General, or the person bringing the action is an original source of the information.
>
> (B) For the purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4). For the FCA jurisdictional bar to preclude Lamers suit, the City has to satisfy both prongs. First, the City must establish that Lamers' action is based on publicly disclosed allegations and transactions. Second, the City must show that Lamers is not an "original source" within the meaning of the statute.

### B. The Public Disclosure Prong

■ The language of 31 U.S.C. § 3730(e)(4)(A) has been pried apart by various circuits and interpreted in subtly different ways. The main points of contention surround the meanings of the phrases "public disclosure," "based upon," and "allegations and transactions." As with any federal statute, our fundamental task in interpreting the FCA is "to give effect to the intent of Congress." *United States v. American Trucking Ass'ns,* 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). Accordingly, perhaps the best way to understand and reconcile the varying interpretations of the public disclosure prong is to foreground its specific policy goal: to prevent opportunistic lawsuits. The City misses this point somewhat, arguing that since the government (specifically the FTA) possessed all essential information prior to Lamers' *qui tam* filing, public disclosure had been effectuated. In fact, an important point of the 1986 amendments was to shift attention from what the government knew to what the public knew. *Findley,* 105 F.3d at 684. Premising the jurisdictional bar on public knowledge rather than government knowledge, which may or may not be publicly accessible, goes right to the crux of the anti-parasitism policy.

Keeping in mind the legislative intent behind the public disclosure prong—to prevent the opportunistic use of public information by would-be relators—this Court asks itself two logical questions: What materials were in the public domain prior to filing? Did the public domain materials include all the elements essential to filing this action? If the answer to the second question is "yes," then the City has satisfied the public disclosure prong.

#### 1. Materials in the public domain

The City points to three types of materials that were arguably made public prior to the filing of Lamers' FCA complaint:

a. *Freedom of Information Act ("FOIA") requests:*

On June 22, 1994, Lamers' counsel wrote to Carter requesting copies of the following documents: the City's FTA grants and grant applications for 1993 and 1994; the City's one-time Standard Assurances; and the City's "Statement of Continued Validity" for 1992, 1993, and 1994. A year later and just before the filing of the present action, Lamers' counsel updated and expanded the request, asking Carter to forward copies of all grant agreements between the FTA and the City covering the years 1993, 1994, and 1995. Lamers' counsel also requested a copy of a videotape of GBT tripper service that Lamers itself had submitted. Following usual procedure, the FTA treated both informal

requests as FOIA requests and promptly forwarded copies of the requested documents to Lamers' counsel and made the videotape available for copying.[1] (Carter Dep. at 134.)

### b. *Prior FTA administrative proceedings:*

As discussed above, Lamers filed its formal complaint with the FTA on July 15, 1994, alleging violations of tripper regulations and misleading assurances of compliance. The subsequent "investigation" relied entirely on materials submitted by Lamers, including a videotape of improper school bus service. The FTA issued its Decision finding that certain regulatory violations had occurred on January 19, 1995. Copies of the Decision were mailed to both Lamers and the City.

### c. *News reports:*

Lamers itself issued a press release about the FTA Decision on January 26, 1995 and attached a copy of the administrative decision. On February 1, 1995, two local papers published stories about the FTA decision and the changes GBT would be forced to make in its transit operations in order to comply with regulations.

The Seventh Circuit has said almost nothing on the issue of what exactly constitutes publicly disclosed material under the FCA. The only case squarely on point, *Houck on Behalf of U.S. v. Folding Carton Admin. Comm.*, 881 F.2d 494 (7th Cir.1989), stands only for the limited proposition that prior civil litigation on precisely the same subject matter is a public disclosure within the meaning of § 3730(e)(4)(A). *U.S. ex rel. Fallon v. Accudyne Corp.*, 921 F.Supp. 611 (W.D.Wis.1995), a recent decision from the Western District of Wisconsin, adopts the analysis of the D.C. Circuit, *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645 (D.C.Cir.1994), and the Tenth Circuit, *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514 (10th Cir. 1996), in concluding that the public's theoret-

ical or potential access to key information upon request is not sufficient to trigger the FCA public disclosure bar. *Fallon,* 921 F.Supp. 611, 625 (W.D.Wis.1995). The information must be affirmatively disclosed and in the public domain. If the source of disclosure is anything *other* than the news media (*i.e.*, "a criminal, civil, or administrative hearing," or "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation" § 3730(e)(4)(A)), then the government must perform some positive act of public disclosure. *Id.*

■ The emphasis on affirmative disclosure expresses a concern that some obscure report or audit, buried in government files but theoretically available to a clairvoyant citizen, will trigger the *qui tam* jurisdictional bar without having really been in the public domain. Thus, what constitutes a "positive act" will vary depending on what type of government source is concerned and the overall factual context. In *Fallon,* the court held that no affirmative act of disclosure had occurred where a Wisconsin Department of Natural Resources investigation was ongoing but incomplete at the time of the *qui tam* filing. Presumably, when an administrative investigation is complete and a decision issued, such as in the present case, there is *per se* affirmative disclosure. *See Fine,* 861 F.Supp. at 1551. As it happens, the FTA Decision at issue here was also widely reported in the media, so could hardly be considered obscure.

The same distinction between theoretically available and actually disclosed materials applies to the FOIA requests made by Lamers' counsel. The Ninth Circuit has held that only materials actually produced in response to FOIA requests are publicly disclosed for FCA purposes. *U.S. ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1520 (9th Cir.1995), *vacated on other grounds*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). Hence, the grant agreements and standard

---

1. The FTA responded to Lamers second FOIA request on July 19, 1995, several weeks after the filing of Lamers' *qui tam* complaint on June 26, 1995. However, because only the 1995 grant agreement would not have been encompassed by the earlier request, and because the content of

the 1995 agreement is predictably similar to that of prior years, this Court does not believe the fact that the copies were sent to Lamers' counsel *after* the FCA complaint was filed is significant for the purposes of the present analysis.

assurances requested and received by Lamers were publicly disclosed, as was the videotape. In any event, the relevant content of the FOIA materials—the City's continuing, *pro forma* assertions of regulatory compliance versus its actual field operations—are implicit and explicit components of the allegations publicly disclosed through the administrative investigation and decision.

Based on the above analysis, the Court concludes that the January 19, 1995 FTA Decision, as well as the actual grant materials and videotape yielded by FOIA requests, were in the public domain prior to the filing of Lamers' complaint on June 26, 1995.

### 2. *Essential elements*

The next question is thornier—given a certain universe of material in the public domain, did that material include all the elements essential to filing this action? Or, as other courts have framed the question using the language of § 3730(e)(4)(A), to what extent was the present *qui tam* action "based upon" material in the public domain? Again, the circuits offer up a variety of readings. The Fourth Circuit has interpreted "based upon" to mean solely "derived from." *U.S. ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1348 (4th Cir.1994). The jurisdictional consequence of this interpretation is to bar only those *qui tam* actions that are purely parasitic, relying completely on information in the public domain prior to filing. The Tenth Circuit, *U.S. ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 552 (10th Cir.1992), and the Sixth Circuit, *U.S. ex rel. McKenzie v. BellSouth Telecomm., Inc.*, 123 F.3d 935, 940 (6th Cir.1997), have concluded that "based upon" means "supported by" in any way. This interpretation produces the opposite effect of barring a great number of *qui tam* actions that rely in part on publicly disclosed materials, but still contribute significant independent information.

▮ The Seventh Circuit has not specifically interpreted the "based upon" language of § 3730(e)(4)(A). In *Fallon*, the district court adopts the reasoning of the D.C. Circuit in *U.S. ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645 (D.C.Cir.1994), which promotes a sort of compromise position, interpreting "based upon" in tandem with "al-

legations and transactions", another hotly disputed phrase in the public disclosure prong. *Fallon*, 921 F.Supp. at 625–26. The basic rationale here is that "the language employed by § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain." *Springfield*, 14 F.3d at 654. The D.C. Circuit proposes an X + Y = Z formulation to illustrate its point: "X" and "Y" are each critical elements; "X + Y" represents the entire fraudulent transaction; "Z" is the allegation of fraud itself. Under this approach, a *qui tam* action is deemed to be "based upon the public disclosure of allegations or transactions" if either "Z" (the allegation of fraud) or "X + Y" (all the critical elements) were in the public domain prior to filing. *Id.* at 654–55.

This Court agrees that the *Springfield* formula strikes a sensible balance among the various interpretations of "based upon" because it stays focused on the information essential to filing the action and asks whether all of it was publicly available—an approach that reflects the legislative intent behind the public disclosure prong. In any FCA action, the minimal essential elements would seem to be the false statements or misrepresentations themselves plus the true factual circumstances ("X + Y"). In the case currently before the Court, information purportedly establishing both those elements was in the public domain before Lamers launched its *qui tam* action.

First, as to the actual false statements, the City's allegedly false grant applications and certifications of compliance were disclosed through the FOIA process. Lamers' complaint also identifies other alleged misrepresentations by GBT officials in correspondence with the FTA over a period of several years. While the actual letters may have been disclosed to Lamers only pursuant to post-filing discovery requests, their content adds little to Lamers' basic assertion that GBT was not being honest about the nature of its school bus service. Significantly, the language of § 3730(e)(4)(A) focuses on "allegations and transactions" and not "evidence."

Under an essential material analysis, additional incriminating evidence does not surmount the jurisdictional hurdle if the critical elements are still in the public domain. *Id.* at 655. The same reasoning defeats Lamers' argument that its *qui tam* complaint is based on undisclosed material because it encompasses FCA violations which took place *after* the administrative decision was rendered, such as the supposedly fraudulent 1995 grant applications and certifications. Again, the "fraud" at base remains the same as that alleged in earlier public materials; ongoing similar violations are presumptively in the public domain.

Second, as to the true factual circumstances, information about the way GBT was actually conducting its school bus operations was also in the public domain prior to filing. The FTA Decision details specific factual findings of impermissible bus service by GBT, based in large part on evidence submitted by Lamers. In the present action, Lamers identifies virtually the same regulatory violations as the factual truth behind the City's alleged falsifications. Specifically, Lamers alleges that GBT tripper routes have not operated as route extensions, but as newly designed routes; that GBT tripper service has been shielded from the public eye due to problems with map design and distribution; and that GBT drivers have not been stopping at all designated transit stops. (*See* Pl.'s Am. Compl. ¶¶ 27–29.) The FTA Decision discusses all of these allegations and arrives at factual and legal conclusions with respect to GBT's degree of compliance. The "truth" about GBT school bus service was thus amply present in the public domain prior to the *qui tam* filing.[2]

Because all the essential elements for bringing this case were publicly available prior to Lamers' suit, the City has satisfied the first prong of the public disclosure bar. Lamers puts forward one additional argument which is not persuasive. Lamers argues that because its 1994 administrative complaint was about whether or not GBT was in regulatory compliance (and not whether or not it was lying to the FTA) all the essential elements for this *qui tam* action were not disclosed by the ensuing Decision. It is true that Lamers' *qui tam* complaint explicitly claims that GBT deliberately deceived the FTA in order to preserve the flow of grant monies to the City. While that precise allegation may not have been made before this action, Lamers clearly raised the question of fraudulent conduct at the administrative stage. For example, Lamers' 1994 FTA complaint asserts that "... GBT has operated federally assisted bus service contrary to the representations made in its standard and continuing assurances regarding compliance with all applicable regulations..." (Def.'s App. Ex. 27 at 6–7.) Furthermore, the undisguised subtext of the 1995 Decision is that Lamers' has alleged some kind of continuing fraud and evasion on the part of the City. The FTA even addresses this assertion in its Decision:

> ... the record does not indicate that GBT has ever willfully or intentionally, violated the regulations at any point in time in total disregard to a request from FTA to cease the improper activity. In fact there is nothing in the record to indicate that in those instances where a violation had occurred, that GBT did not take appropriate action to correct any violation upon an appropriate determination by FTA... (Def.'s App. Ex. 29 at 5.)

In its *qui tam* complaint, Lamers does not cite any additional, non-disclosed evidence going directly to the question of intentional fraud but continues to rely on the alleged

---

**2.** The City makes an interesting argument which Lamers derisively dubs the "plain view" disclosure scenario. The City argues that because bus transit is inherently public in nature, the factual reality of GBT's school bus service was always effectively in the public domain. The argument has a kind of intuitive appeal—it's true that any astute and/or obsessive Green Bay citizen could have made the field observations supplied by Lamers. Further, a proper application of the public disclosure bar should prevent the theoreti-cal deluge of *qui tam* filings based on such inherently "public" circumstances. Lamers' best response to this argument is that "plain view" disclosure is not a listed method of disclosure under § 3730(e)(4)(A). Based on the language of the statute, only disclosures resulting from "a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media..." can trigger the jurisdictional bar.

inference of foul play raised by the evidence cited in the FTA Decision. Thus, with respect to the current FCA charges only the legal theory and forum have changed, but the essential allegation of fraud remains the same. "A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed." *Findley*, 105 F.3d at 688.

## C. The Original Source Exception

■ Having concluded that the essential elements of Lamers' *qui tam* complaint were publicly disclosed, the Court must now find that Lamers is an "original source" within the meaning of the FCA to retain jurisdiction over this action. Section 3730(e)(4)(B) presents two criteria for qualification as an "original source." [3]

First, the statute requires an original source to have "direct and independent knowledge of the information on which the allegations are based." Numerous courts agree that this requirement insists on both direct *and* independent knowledge. *See, e.g., Springfield*, 14 F.3d at 656. "Direct" signifies "marked by absence of an intervening agency." *Id.* "Independent knowledge" is knowledge that does not derive from prior public disclosure. *Houck*, 881 F.2d at 505.

In addition, the D.C. Circuit has reasoned that the phrase "information on which the allegations are based" in the original source exception should be interpreted consistently with the distinction between essential elements ("X" and "Y") and allegations or transactions ("Z" or "X + Y"), which informed its analysis of the first prong of the public disclosure bar. *Springfield* at 656–57. Original sources should be independently aware of some essential piece of information, but need not have direct knowledge of *all* of the vital

ingredients in a fraudulent transaction. *Id.* This understanding fulfills the legislative intent behind the original source exception as codified in 1986: to preserve "adequate incentives for whistle-blowing insiders with genuinely valuable information." *Findley* at 80. Further, as Congress recognized, potential relators rarely will have direct and independent knowledge of all essential elements in an FCA action. At least one element will generally involve primary communications between the defendant and the government—namely, the defendant's misrepresentations to the government. *Id.* The City spots this deficiency in the present case, arguing that Lamers had no direct and independent knowledge of the City's allegedly false grant applications and misrepresentations to FTA officials. While this may be true, if Lamers does possess direct and independent knowledge of another essential element, its claim to original source status survives.

The second requirement of § 3730(e)(4)(B) states that an original source must have "voluntarily provided the information to the Government before filing an action under this section which is based on this information." The D.C. Circuit again provides one clarification of this requirement which pertains to our facts. As the court reasoned in *Findley*, the prior disclosure to the government required by subparagraph (B) would be superfluous if *public* disclosure under subparagraph (A) had already occurred. *Findley* at 690–91. Although the goal of the original source exception is to protect and encourage the whistle-blowing plaintiff, once the information is in the public domain, there is little need to prod the government into action via a *qui tam* complaint. *Id.* Thus, the relator must have provided the information to the government *before* public disclosure in order to satisfy the second original source requirement.

---

**3.** Based on legislative history and a strained reading of the meaning of the word "information" in subparagraphs (A) and (B), several circuits have imputed yet a third criterion for qualification as an original source: that the relator have been a direct or indirect source to the entity making the initial public disclosure. *See, e.g., U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16–18 (2nd Cir.1990); *Wang v. FMC*

*Corp.*, 975 F.2d 1412, 1419 (9th Cir.1992). This Court finds the D.C. Circuit analysis rejecting a third criterion to be more straightforward and true to the language of the statute. *See Springfield*, 14 F.3d at 656–57; *Findley*, 105 F.3d at 689–91. More importantly, the facts before me do not make the third criterion significant—Lamers was a direct source to both the FTA and the news media.

Applying the above analysis to the facts, Lamers qualifies as an original source. The "essential element" of which Lamers can be said to have direct and independent knowledge is the "true" nature of GBT's field operations or, stated differently, the extent of the City's compliance with federal transit regulations. Lamers' knowledge of GBT tripper service is "direct" because Lamers' employees and representatives gleaned this information from close, first-hand observation of GBT drivers on their appointed routes, route map distribution, and other aspects of the school bus program. Since buses run on public streets, presumably any Green Bay citizen could be privy to this "direct" knowledge. While this fact seems odd given the typical notion of the *qui tam* relator as an "insider" with valuable information, nothing in the definition of "direct" excludes knowledge theoretically obtainable by another zealous citizen. Further, courts have held that an "investigation" undertaken at the relator's own initiative may form the basis for a *qui tam* action. *See U.S. ex rel. Hartigan v. Palumbo Bros., Inc.,* 797 F.Supp. 624, 630–31 (N.D.Ill.1992). Lamers' knowledge of the offending bus service is also "independent" because it does not derive from prior public disclosure. In fact, Lamers' investigative efforts constituted the primary source for entities ultimately making those disclosures.

As for the second original source criterion, Lamers has clearly provided the "information" resulting from its own investigation to the FTA on several occasions prior to the filing of this action in June, 1995. Lamers filed its first informal complaint in June, 1993, and its official complaint in July, 1994. Supporting materials including a videotape depicting GBT tripper service were submitted to support Lamers' claims. In addition, Lamers' representative Kruschke personally guided FTA regional counsel Carter in his observation of GBT tripper routes in April, 1995. Finally, much of the relevant information was provided to the FTA prior to public disclosure through the 1995 Decision, FOIA requests, and news reports. Indeed, the record makes clear that Lamers has been tirelessly fueling the fire behind FTA investigation of GBT school bus service from the beginning and for quite some time. Because it satisfies both the spirit and the letter of the relevant statutory criteria, Lamers is entitled to status as an "original source" under § 3730(e)(4)(B). Consequently, the jurisdictional challenge presented by the City's motion to dismiss must fail.

The City makes one additional argument which I find unpersuasive. Essentially, the City suggests that the named relator, Allen Lamers, cannot qualify as an original source because he has not fulfilled the statutory requirements in his individual capacity. For example, the City draws a distinction between the observations and resulting "direct knowledge" of Kruschke, Lamers' School Operations Manager since 1975, and the knowledge of the named relator Allen Lamers, corporate Vice–President since 1973. The City further argues that because counsel for Lamers Bus Lines as opposed to the individual relator himself provided certain information to the FTA, Lamers fails to satisfy the voluntary disclosure requirement. To draw the distinction suggested by the City, between Allen Lamers on the one hand and the employees of Lamers Bus Lines on the other, would unreasonably elevate form over substance.

The Court is not certain why "Lamers Bus Lines, Inc." is not named as the relator instead of "Allen Lamers." Lamers' counsel may have simply felt that the complaint would be better received with an individual relator rather than a corporate entity. The *qui tam* provisions describe actions by "private persons" on behalf of the government, and on the whole, the FCA language and history do seem to contemplate actions brought by *individuals*—those brave insiders blowing the whistle on their employers. But there is no case law to suggest that legal entities such as corporations are precluded from maintaining *qui tam* actions. Law firms have brought successful *qui tam* suits under the FCA, as have state attorneys general on behalf of individual states. *See, e.g. U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.,* 985 F.2d 1148 (2d Cir.1993); *U.S. ex rel. Hartigan v. Palumbo Bros., Inc.,* 797 F.Supp. 624 (N.D.Ill.1992).

Whatever the reasons for making Allen Lamers the relator, I am satisfied that he qualifies as an original source. Lamers Bus Lines is a closely held family corporation. The relator states in his affidavit that "[i]n order to protect Lamers' interests, I have taken steps to monitor and investigate all actions taken by [the City] which might compete with Lamers business, including its school bus activities." (Lamers Aff. ¶ 6.) He further attests that all investigation and observation of GBT tripper service by counsel, Kruschke, and other Lamers' employees was done at the relator's behest and under his active coordination. (*Id.* ¶¶ 7–11.) The City cites *U.S. ex rel. Fine v. MK–Ferguson Co.*, 99 F.3d 1538, 1547–48 (10th Cir.1996), to support its argument that only the individual doing the actual investigatory gruntwork can claim "direct and independent knowledge". *Fine* does not support that proposition[4], nor does history or logic. The Court concludes that although the present action is based on publicly disclosed material, the relator is an original source within the meaning of § 3730(e)(4)(B). Accordingly, the City's motion to dismiss for lack of subject matter jurisdiction is denied.

### III.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The City next moves for summary judgment on both counts of Lamers' amended complaint. Count I alleges a violation of subparagraph (a)(2) of 31 U.S.C. § 3729 and claims that since 1993, for the purpose of obtaining federal transit assistance grant funds, the City has repeatedly misrepresented the nature of its tripper service and has provided false assurances to the FTA that GBT was complying with all applicable regulations. Count II alleges a violation of subparagraph (a)(7) of § 3729 and claims that since 1993 the City has engaged in precisely the same fraudulent conduct identified in Count I, but for the purpose of *retaining* federal transit assistance grant funds. The

elements which need to be proven for a successful claim under either subparagraph are essentially the same, except that § 3729(a)(7), the so-called "reverse false claims" provision, presents additional legal issues based on the facts of this case. Consequently, although I discuss the Count I claims first, much if not all of the analysis and conclusions apply equally to claims under Count II. Additional issues raised by Count II are discussed in the final section.

The Court considers the present motion with the knowledge that summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In weighing a summary judgment motion, courts should construe evidence in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, a genuine issue of material fact is not demonstrated by the existence of "*some* alleged factual dispute between the parties," *id.*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Pointing to the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to establish a material factual dispute. *Anderson*, 477 U.S. at 252. Rather, a genuine issue of material fact does not exist unless "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249.

### A. Count I—Lamers' Claims Under § 3729(a)(2)

■ Count I of Lamers' amended complaint relies on § 3729(a)(2) of the FCA,

---

**4.** Factually, *Fine* is completely distinguishable. The individual relator in *Fine* played no meaningful role in directing the underlying fact-gathering investigation and audit, which were performed by an independent firm contracted by the Department of Energy's Office of the Inspector General. *99 F.3d 1538 (10th Cir.1996).*

which attaches liability to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." A cause of action under this provision requires proof of three elements: (1) that the defendant made, used, or caused to be made or used, a record or statement to get a claim against the United States paid or approved; (2) that the record or statement and the claim were false or fraudulent; and (3) that the defendant knew the record or statement and the claim were false or fraudulent.[5] To prevail on the merits in an FCA action, 31 U.S.C. § 3731(c) requires the government or private relator to prove each essential element by a preponderance of the evidence. Thus, to survive a summary judgment motion on Count I, Lamers must produce specific and sufficient evidence to permit a reasonable jury to find that each essential element has been proven under the preponderance of evidence standard. I consider each element in turn.

### 1. *Were statements made in order to get a claim paid or approved?*

■ At the outset, the parties clash over which generic types of false statements or false claims are appropriately at issue in this case. Section § 3729(a)(2) makes any person who has knowingly used a false statement to get a false claim paid or approved liable for a discrete statutory penalty, plus three times the damages sustained by the government. The statute defines a "claim" as

> any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded...

31 U.S.C. § 3729(c). Both the statutory language and subsequent cases clearly establish that "false claims" under the FCA are not limited to legally enforceable claims for amounts supposedly owed by the government, such as inflated invoices, but include

"all fraudulent attempts to cause the Government to pay out sums of money." *U.S. v. Neifert–White Co.,* 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968). The key inquiry is whether the "claim" in question "has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." *U.S. v. Rivera,* 55 F.3d 703, 710 (1st Cir.1995).

Neither party seriously disputes that the City's grant applications and standard assurances in 1993, 1994, and 1995, could constitute "false claims" within the meaning of the Act. Lamers' action might helpfully be termed a "false certification" FCA action. Although the archetypal *qui tam* FCA action is brought by a whistleblower employee who discovers that her private corporate employer has overcharged under a government contract, FCA claims have proceeded under numerous theories, including cases like Lamers which allege false certifications of compliance and violations of federal grant requirements. *U.S. ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir.1996). *See also U.S. ex rel. Milam v. Regents of Univ. of Cal.,* 912 F.Supp. 868 (D.Md.1995).

What the parties do dispute is the significance of the other set of "false statements" alleged by Lamers—specifically, all those statements about GBT tripper service and compliance efforts made by City officials in correspondence with the FTA. The City argues that the only relevant statements by the City are the actual "false claims," or the annual grant applications and assurances. For support, the City cites *Rivera,* holding that "the [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" 55 F.3d at 709. Lamers, on the other hand, seems to argue that not only are other informal representations by the City properly at issue, but that each independent false assertion gives rise to its own potential liability under § 3729(a). In truth, both parties confuse what triggers *liability* with what is *relevant* to establishing

---

5. Some courts have wrongly included the additional element that the United States must have suffered actual damages. This is not true under

a plain reading of the statute and is rejected by precedent. *See U.S. v. Hughes,* 585 F.2d 284, 286 n. 1 (7th Cir.1978).

the elements of a cause of action under § 3729(a)(2).

Unlike § 3729(a)(1), which creates a similar liability for simply presenting a false claim for payment, subparagraph (a)(2) must involve the production or use of a false statement or record *on behalf of a false claim.* As our sister district has observed, for the two provisions to have distinct meanings, a "false statement or record" must imply something other than the underlying false claim. *Fallon,* 921 F.Supp. at 627. Forced to make this distinction, the City would argue that only the *pro forma* assurances submitted with each annual grant application can potentially be considered false statements in support of false claims. Lamers would, of course, assert that even comments made informally in letters to FTA officials could be considered false statements in support of the underlying false applications.

In this instance, the Court agrees with Lamers. Although, for example, the link between statements made by letter to an FTA official months after the City had submitted its grant application (but *prior to* approval) is more attenuated than those assurances submitted along with the application, because of the ongoing grantor-grantee relationship and the advisory role of the FTA, the Court finds that all erroneous representations about compliance matters become part of a "false record" that is created in support of a pending application for financial assistance, the putative "false claim." Thus, for the purpose of assessing the evidence of falsity or fraud, particularly at the summary judgment stage, I think the content of informal communications between the City or GBT and the FTA is highly relevant. However, liability for actual damages is still predicated on the actual claim for payment. *See, e.g. U.S. v. Bornstein,* 423 U.S. 303, 312, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) ("... the statute imposes liability only for the commission of acts which cause false claims to be presented.") This distinction becomes significant in light of the FCA's statutory damages scheme, which assigns a civil penalty of be-

tween $5000 and $10,000 for each "act" in violation of the statute. 31 U.S.C. § 3729(a).

In sum, Lamers can establish the first element of a claim under § 3729(a)(2): that the statements in question—found in formal certifications of compliance *and* unofficial correspondence—were made in order to get a claim paid or approved. Whether GBT's standard assurances and other representations to the FTA *actually caused* the government to extend money to the City is another matter that goes to Lamers' entitlement to actual damages under § 3729(a), should he prevail on the merits.

### 2. *Were the statements and claims "false or fraudulent"?*

 The FCA does not define "false" or "fraudulent," unlike the Act's other key concepts. Although discussing "falsity" as a distinct element in an FCA violation has a certain heuristic appeal, in practice courts have found it impossible to give meaning to the term without also implicating the third element, the requirement that the defendant had "knowledge" of the alleged falsity. The Seventh Circuit has held that "[i]nnocent mistakes or negligence are not actionable under [the FCA]." *Hindo v. Univ. of Health Sciences,* 65 F.3d 608, 613 (7th Cir.1995). Errors based on faulty calculations or flawed reasoning are not false under the FCA. *Wang v. FMC Corp.,* 975 F.2d 1412, 1420–21 (9th Cir.1992). Imprecise statements or differences in interpretation growing out of a disputed legal question are not false under the FCA. *Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1477–78 (9th Cir.1996). "In short, the claim must be a lie." *Hindo,* 65 F.3d at 613.

 The inseparability of the falsity element and the scienter element is consistent with the whole purpose behind the FCA, which is to combat fraud on the government, not scrutinize statements for facial inaccuracies. Just as a claim of fraud at common law requires "intent to defraud" as an essential element[6], statements or claims which are "false" within the meaning of the FCA must

6. In Wisconsin, the elements of a common law fraud claim are false representation, intent to defraud, and reliance on the misrepresentation

resulting in damages. *Insurance Co. of N. Am. v. Universal Mortgage Corp.,* 82 Wis.2d 170, 175, 262 N.W.2d 92, 94 (1978).

be more than objectively untrue—they must betray or suggest intentional deceit.

The same standard applies to representations about future performance such as the City's annual assurances of continuing compliance, a large portion of the alleged false statements in this action. The City argues that statements of intention to comply with regulatory standards merely predict future conduct and thus are never "false" *per se.* In fact, so-called "promissory fraud" is a legitimate claim under the FCA, though difficult to sustain. *See, e.g., Hopper,* 91 F.3d at 1267. Any promise to perform is not only a prediction but a statement of existing intent, and thus capable of misrepresentation. *See generally U.S. v. Shah,* 44 F.3d 285 (5th Cir.1995). But to prove falsity as described above, Lamers has to show that the City's promises, or standard assurances, were known to be false at the moment they were made—that GBT never had any intention of complying with applicable FTA regulations. *Id.* at 290.

The Court's application of the falsity standard to the facts is necessarily combined with a factual discussion of scienter, the third element set forth below.

### 3. Did the City "knowingly" make the false or fraudulent statements and claims?

In 1986, Congress overhauled the FCA on many fronts to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government." S.Rep. No. 99–345, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266. To achieve this end, one legislative strategy was to lower the standard of proof needed to show culpability. Prior to the 1986 amendments, a number of federal circuits had held that the FCA required proof that a defendant acted with the specific intent of deceiving the government. *See generally U.S. v. TDC Management Corp.,* 24 F.3d 292, 296–97 (D.C.Cir.1994). The Seventh Circuit was among a handful of circuits that had ruled just the opposite, that

proof of specific intent was not a requisite element under the Act as it then stood. *Id.*

Congress resolved the conflict in 1986 by clarifying the standard of intent in a new subsection § 3729(b), which defines knowledge for FCA purposes. Subsection (b) states that to act "knowingly" means

> that a person, with respect to information—
>
> (1) has actual knowledge of the information;
>
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (3) acts in reckless disregard of the truth or falsity of the information;
>
> and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b). By defining knowledge to include situations in which a defendant has not actual but constructive knowledge, Congress sought to address the increasingly familiar "ostrich-like" conduct of corporate officers, who had been able to insulate themselves from FCA liability for false claims submitted by unwitting subordinates. S.Rep. No. 99–345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272. The express provision that no proof of specific intent was required under the FCA was part and parcel of Congress' attempt to hold large corporations accountable for the fraudulent schemes of high-level executives, who had used the more stringent proof of intent standard in some circuits to successfully assert lack of knowledge.[7] The redesigned intent standard, however, was not meant to set a trap for the unwary or change the fundamental FCA goal of identifying truly fraudulent conduct: "The Committee is firm in its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence." *Id.* Thus, although proof of specific intent to defraud is ruled out as a requisite element, Congress has not thereby converted the FCA into a strict liability statute for technically inaccurate claims.

---

7. In 1986, fraud was pervasive within the defense industry. S.Rep. No. 99–345, at 1–2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266 ("While it may be difficult to estimate the exact magnitude of fraud in Federal programs and procurement, the recent proliferation of cases among some of the largest contractors indicates that the problem is severe.")

The 1986 FCA amendments altered the terrain with respect to culpability in another respect. As discussed in my analysis of the City's motion to dismiss, government knowledge (rather than public disclosure) of the facts underlying a *qui tam* action operated as a complete bar to district court jurisdiction prior to 1986. Once public disclosure became the linchpin of the jurisdictional scheme, the effect of government knowledge on the viability of an FCA claim was thrown to the courts to decide. *U.S. ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 326 (9th Cir.1995). The Ninth Circuit has been particularly active in establishing the contours of what has come to be known as the "government knowledge defense" to FCA liability. In essence, the defense suggests that the "knowing" submission of fraudulent claims is logically impossible when responsible government officials have been fully apprised of all relevant information. Since the crux of an FCA violation is intentionally deceiving the government, no violation exists where the government has not been deceived.

In *Butler*, for example, the United States Army and the defendant, a manufacturer of military helicopters, maintained a pattern of close communication over the course of a complicated, highly technical procurement program. Although the *qui tam* relator produced evidence that certain testing requirements were not met despite official statements to the contrary, the court held that because the Army was fully aware of and acceded to all deviations from the testing regime, the defendant had not acted with the requisite intent to deceive. 71 F.3d at 326–29. Under similar facts, the court in *Wang v. FMC Corp.*, another case involving a defense contractor, concluded that "[t]he fact that the government knew of FMC's mistakes and limitations, and that FMC was open with the government about them, suggests that while FMC might have been groping for solutions, it was not cheating the government in the effort." 975 F.2d 1412, 1421 (9th Cir.1992).

Although the Seventh Circuit has not expressly adopted the government knowledge defense as such, the equitable rationale behind the defense has an impressive pedigree in this circuit. *U.S. v. Schmidt*, 204 F.Supp. 540 (E.D.Wis.1962), held that a veteran's application for free medical treatment which misrepresented his ability to pay hospital expenses was not "false" within the meaning of the FCA because the veteran had fully disclosed his true financial condition to the Veterans Administration Hospital admissions clerk. *Id.* at 544. In *U.S. v. Fox Lake State Bank*, 366 F.2d 962 (7th Cir.1966), the Seventh Circuit held that the defendant bank's culpability under the FCA for submitting Federal Housing Administration ("FHA") insurance claims for loans made under terms known to be fraudulent was mitigated by government knowledge:

> To impose the severe penalty here sought against the Bank for failure to include in the claims the full details of the loans is to ignore the long history of correspondence and conferences between the Bank and FHA employees from which the Bank rightly assumed that the FHA was in full possession of all the facts.

366 F.2d at 965. At least one recent unpublished district court decision in this circuit has applied the *Fox Lake* reasoning in analyzing FCA claims. *See U.S. v. Frierson*, No. 95–C–503, 1997 WL 136280 (N.D.Ill. March 20,1997).

█ This Court concludes that, while an FCA violation "is not automatically exonerated by any overlapping knowledge by government officials," *U.S. ex rel. Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1156 (2nd Cir.1993), the presence of an open dialogue with government officials about relevant factual circumstances does mitigate a defendant's specific intent to defraud, or the degree to which false statements and claims were "knowingly" submitted.

### 4. *Factual discussion of individual § 3729(a)(2) allegations.*

█ In addition to the comprehensive standard assurances submitted with each grant application in 1993, 1994, and 1995, Lamers' amended complaint identifies three letters from GBT or City officials to the FTA which could arguably contain false representations about GBT tripper service made in

support of the City's underlying requests for financial assistance: Gretzinger's June 30, 1993, response to Lamers' initial informal complaint; Gretzinger's August 12, 1994, response to Lamers' official administrative complaint; and Schmidt–Lehman's February 15, 1995, response to the FTA Decision. The factual appendices of both parties also further document the post-Decision correspondence between the City and Dorval Carter leading up to the approval of the City's 1995 application on June 8, 1995. Based on my analysis of Lamers' alleged § 3729(a)(7) "reverse false claims" in subpart "B" of this decision, it is unnecessary to discuss any alleged false statements made to the FTA after the 1995 grant funds had been approved. Accordingly, this section discusses Lamers' false claim allegations in the following clusters: (a) the City's 1993 Standard Assurances; (b) Gretzinger's letters of June 30, 1993, and August 12, 1994; (c) the City's 1994 Standard Assurances; and (d) all post-Decision representations up to June 8, 1995, including the City's 1995 Standard Assurances.

### (a) The 1993 Standard Assurances

The City's March 22, 1993, Statement of Continued Validity reaffirmed the 1989 Standard Assurances, stating generally the City's intention to comply with all applicable regulations in its pilot program bus service for the District. Lamers alleges, as it must to state an adequate claim of promissory fraud under the FCA, that these certifications of future compliance were lies at the moment they were made. Lamers asks the factfinder to infer knowing deceit on the part of the City based on several items.

Lamers first points to two written proposals describing the City's planned school bus service in its early stages. In fact, GBT's written proposals to the District offer no support for Lamers' contention that the City's promise to comply with regulations was a calculated sham. For example, the May 28, 1993 Proposed Service Outline appropriately states: "Also note that all Green

Bay Transit bus routes are open to the general public at all times. At no time will Green Bay Transit offer exclusive service for school children." (Def.'s App. Ex. 20 at 2.) Lamers argues that the written proposals reveal a tripper service plan whose overall design violates applicable regulations. But as my discussion in the next section indicates, the whole debate over whether GBT tripper routes were operating as extensions of previous routes or as newly designed, free-standing routes, though passionately pursued by Lamers throughout this action, is something of a regulatory red herring.

Lamers next points to the following inactions as evidence that Gretzinger and GBT had something to hide: Gretzinger failed to immediately notify the GBT Commission about Lamers' informal complaint in June, 1993, before the pilot program was approved; GBT failed to provide notice to private transit operators or to conduct a public hearing on the proposed service as required by law.[8] Even assuming this characterization of the applicable public notice requirements is accurate and absolute (which the Court declines to find), the oversights identified by Lamers do not support a legitimate inference that the City conceived an elaborate scheme to deceive the FTA prior to the implementation of the pilot program, and then intentionally lied about it.

### (b) Gretzinger's letters of June 30, 1993, and August 12, 1994

Like the City's annual assurances, Gretzinger's responses to Lamers' FTA complaints promise general compliance with applicable transit regulations. The letters differ in substance from the official certifications of compliance in only one respect: they specifically identify GBT bus service to the District as tripper service and describe that tripper service as "an extension of regular routes." (Def.'s App. Ex. 25.) Lamers claims throughout its amended complaint that GBT's characterization of its tripper routes as extensions of pre-existing routes was false and fraudulent. This pur-

8. Lamers makes no claim that GBT improperly noticed any meeting under the Wisconsin Open Meetings Law.

ported misrepresentation is perhaps the central "lie" alleged in this action, and no doubt the most galling for Lamers, who believed his own private school bus routes were being replicated by the City under the guise of "route extensions."

The dispute between these parties over the proper design of tripper routes dates back to 1981. Lamers filed an administrative complaint in 1981 alleging, in part, that GBT's route deviations to several schools constituted impermissible school bus operations under 49 C.F.R. Part 605. GBT's limited school service at the time operated as extensions of regular, published routes. The Urban Mass Transportation Administration ("UMTA"), the FTA's predecessor agency, issued a decision on Lamers complaint in 1982, commenting that "our investigation disclosed misunderstandings of the regulations." (Pl.'s App. Ex. 2 at 1.) UMTA concluded that for the most part GBT's route extensions to schools were legitimate tripper service but ordered the City to make several minor changes, such as removing the word "school" from bus destination signs and publishing route deviations. However, the 1982 Decision clearly notes that "the basic route configuration comports with UMTA requirements." (*Id.* at 5.)

Lamers argues today that the 1982 Decision put GBT and Gretzinger (then GBT resident manager) on notice as to the precise requirements for permissible tripper service.

Unfortunately, the 1982 Decision may have also perpetuated the misunderstanding that legitimate tripper routes *had* to be operated as extensions of regular routes. A 1989 memo from GBT management to all transit operators suggests that this misunderstanding endured as GBT policy:

> Because a tripper is scheduled to assist a regular route, the tripper must operate on the established routes. The tripper must display the destination sign of the route it is operating on.
>
> Any passenger may board a tripper route at any point during that route. . . .

(Pl.'s App. Ex. 3 at 2.)

It's easy to understand how someone could misunderstand the tripper regulations on this point. The last sentence of the tripper definition states in part that "[a]ll routes traveled by tripper buses must be within a grantee's or operator's regular route service as indicated in their published route schedules." 49 C.F.R. § 605.3. Whether "regular route service" in the definition refers to pre-existing, non-student routes or to a modified route service including the new, free-standing tripper routes is not immediately clear. The FTA says the latter interpretation is correct.[9] Tripper routes themselves should be considered part of the regular route service from the moment of their inception. According to Carter, whose job includes providing regulatory interpretation on behalf of the FTA, the tripper concept[10] is primarily

---

9. Courts must give substantial deference to an agency's interpretation of its own regulation, unless plainly erroneous or inconsistent with the plain language of the regulation. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

10. The appearance of the tripper service concept in FTA regulations is interesting. The Part 605 school bus regulations implement 49 U.S.C. § 1602(g), a 1973 amendment to the Urban Mass Transportation Act of 1964 and Congress' first expression of its desire to protect private school bus operators from federally funded competition. Section 1602(g), much like the current 49 U.S.C. 5323(f), denies financial assistance for public transit that "engage[s] in school bus operations, *exclusively* for the transportation of students and school personnel, in competition with private school bus operators" (emphasis added). Legislative history makes clear that Congress did not intend this directive to squelch *all* use of public

transit for school-related purposes or school-bound riders:

> [T]he intent and legal effect of this section will not prevent those cities which have their own mass transit buses to allow them to be used by riders of school age to travel at reduced fares, nor to prohibit the routing of a public transit bus adjacent to school facilities, as a part of the regularly scheduled bus system service for any passenger.

119 Cong. Rec.28102 (1973)(statement of Rep. Kluczynski, Chairman of the Transportation Subcommittee).

The original proposed rules implementing § 1602(g) contain no reference to tripper service. *See* Charter and School Bus Operations, 40 Fed. Reg. 25303, 25309 (1975)(proposed June 10, 1975). The final version of the rules, issued after much public comment, includes the unheralded tripper concept. *See* Charter and School Bus Operations, 41 Fed.Reg. 14121, 14127 (1976)(to

about public access: "FTA's position is that so long as the general public has access to that tripper service, that it is not considered exclusive service that only serves the needs of one particular group and is, therefore, eligible for federal funding." (Carter Dep. at 22.)

▮▮▮▮▮ The parties now appear to concede that FTA regulations do not require tripper routes to be designed as extensions of pre-existing routes. (Transcript of February 20, 1998, Oral Argument at 52, 56.) In any event, nothing in the record permits a reasonable inference that the City was pretending to misunderstand the tripper service requirements in order to deceive the federal government. The record does suggest, however, that GBT was genuinely confused about restrictions on tripper route configuration. As late as June 1, 1995, at the meeting convened by Carter to discuss the City's compliance efforts in the wake of the FTA Decision, Gretzinger and Schmidt–Lehman asked Carter for an exact definition of tripper service. (Def.'s App. Ex. 33 at 2.) Carter recalls "a light bulb going on halfway through the meeting that we had been talking past each other in terms of their use of the term tripper and my use of the term tripper." (Carter Dep. at 78.) While this suggests that GBT and the City might have been lax about doing their homework, nothing supports the inference that the City feigned confusion as part of an elaborate scheme to defraud the FTA. Innocent mistakes or negligence are not actionable under the FCA. *Hindo*, 65 F.3d at 613. Exploring the boundaries of a disputed legal question is

not actionable under the FCA. *Hagood*, 81 F.3d at 1478.

Finally, even assuming that GBT knowingly mischaracterized its tripper routes as "extensions" or "deviations" under the mistaken belief that tripper service had to be offered that way, this misrepresentation was not *material* in the sense that it had any impact on the FTA's funding decision. Lamers claims that the FTA forwarded grant funds to the City in reliance on GBT's false description of its tripper service as "extensions of regular routes." The record does not support this inference. No communication from FTA officials or the 1995 Decision suggests that the agency's belief that GBT trippers operated as route extensions was key to agency funding decisions. The public access tripper requirements remained the same regardless of whether the routes were extensions or independent routes. FTA regulations expressly allow the City to design separate routes to accommodate students. 49 C.F.R. § 605.3. Thus, in the context of funding decisions, whether the routes were extensions or separate routes made little difference to the FTA. (*See, e.g.,* Carter Dep. at 78–79.) No false statement made with respect to this question could be a material misrepresentation under an FCA analysis.

The Fourth Circuit has held that the FCA imposes a materiality requirement. *U.S. ex rel. Berge v. Board of Trustees of Univ. of Ala.*, 104 F.3d 1453, 1459 (4th Cir.1997). *See also Tyger Constr. Co. v. United States*, 28 Fed. Cl. 35, 55 (1993) ("[T]he FCA covers only those false statements that are material.") In the civil context, courts have defined "material" by employing the well-established

be codified at 49 C.F.R. Part 605). Later comments from UMTA, in response to complaints from private transit operators who felt the regulations did not reflect the private operator protection envisioned by Congress, justified tripper service as a logical extension of Congress' prohibition of only "exclusive" school bus operations. *See* Charter and School Bus Operations, 47 Fed. Reg. 44795, 44803 (1982)(notice of proposed alternatives to existing regulations).

In practice, however, it does seem that tripper routes can operate very much like exclusive school bus routes while still complying with the tripper definition. Tripper routes need only be clearly marked as open to the public and stop at all designated stops on a published route map.

Beyond that, public transit providers are more or less free to design their tripper routes to primarily accommodate the needs of students, even if that means replicating the routes of private school bus operators. Because the routes are classified as "tripper service" and not "school bus operations" under § 605.3, public entities running tripper routes are exempt from many of the notice and other requirements set forth in Part 605. From the perspective of private school bus operators, this is a loophole you can drive a bus through.

The Court notes, however, that agencies have broad discretion under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

standard for judging materiality in criminal cases: whether the false statement has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed.[11] See, e.g., Weinstock v. United States, 231 F.2d 699, 701–702 (D.C.Cir.1956). The Supreme Court has approved the use of this materiality standard in civil cases. See Kungys v. United States, 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (concerning the materiality of false statements made in a denaturalization proceeding).

In sum, this Court finds no evidence to support a reasonable inference that the City intentionally feigned confusion about tripper requirements in order to defraud the federal government. In the alternative, even if Gretzinger knowingly mischaracterized GBT routes as extensions, his statements are not material and therefore are not actionable false statements in support of false claims within the meaning of the FCA.

### (c) The 1994 Standard Assurances

GBT tripper service for the District had been operating for approximately seven months when the City submitted its 1994 Standard Assurances to the FTA in support of its 1994 application for transit assistance. Thus, although the 1994 certifications are identical to the 1993 submissions, they impliedly certified ongoing as well as future regulatory compliance. Lamers argues that those assurances were false and fraudulent because the City had knowingly violated tripper regulations since commencing its pilot program, and intended to continue operations in the same impermissible manner.

Most of Lamers' evidence regarding alleged GBT misconduct establishes the same technical violations cited in the 1995 FTA decision. These violations include the following: Route deviations to schools were not systematically published and distributed;

Tripper buses sometimes ran express to route deviation points or express between tripper routes, not stopping at designated stops; Drivers sometimes made accommodation stops, picking up or dropping off children mid-block rather than at corners, which was GBT standard policy.

Lamers also submitted additional evidence suggesting that GBT's attempt to operate free-standing tripper routes as extensions, though not in itself a violation, created some public confusion with respect to route names and destination signs. There was also some evidence that some drivers making school pick-ups were instructed to wait up to ten minutes longer than usual for children to board the bus, although this occurred more frequently in winter when the children needed time to bundle up. Finally, Lamers produced one bus driver, Dale Detrie, who said that he was instructed to terminate a route and return to the garage if no students boarded the bus and also to tell adults trying to board tripper buses full of students to wait for the "regular bus." Detrie did not say who gave him these instructions.

This evidence, taken in the light most favorable to Lamers, does not give rise to a reasonable inference that the City intentionally misrepresented bus service it knew to be non-compliant. First, the technical violations committed by GBT do not trigger an actionable claim under the FCA. See, e.g. Hopper, 91 F.3d at 1265 ("It is not the case that any breach of contract, or violation of regulations or law . . . automatically gives rise to a claim under the FCA.") Lamers must show that the City knew that these activities were occurring on at least a semi-regular basis and that they constituted violations of applicable regulations; and that the City intended to misrepresent that state of affairs to the FTA in order to gain approval of City grant applications. The FCA is not a vehicle to police compliance with administrative regulations.

---

11. United States v. Gaudin, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), recently held that the materiality of false statements under the criminal false statements statute is an element of the crime and thus a jury question. However, the Court premised its analysis on a criminal defendant's Fifth and Sixth Amendment rights to a jury determination of guilt on each criminal

element, and expressly declined to extend its holding to the civil context. Id., 515 U.S. at 516–17 ("But the courts' power to resolve mixed-law-and-fact questions in civil cases is not at issue here; civil and criminal juries' required roles are obviously not identical, or else there could be no directed verdicts for civil plaintiffs.")

Further, the very fact of non-compliance does not create an inference that the City lied in certifying past or future compliance. *Id.* at 1267, 1268.

The Court is convinced that there is not more than a "scintilla" of evidence to support the proposition that GBT's technical violations amounted to an intentional effort by the City to defraud the federal government. At oral argument, Lamers' counsel was asked:

Is there any evidence that Green Bay Transit instructed drivers to stop mid block or otherwise violate the regulations? Evidence that the drivers were instructed or there was some official policy of non-compliance?

(Oral Arg. Tr. at 57.) Lamers' counsel responded, identifying only Mr. Detrie's testimony:

Well, Mr. Detrie in his testimony I think implied that what he was doing was based on instructions from his supervisors. There's been no acknowledgment by supervisors they so instructed drivers. And I think it would be more of an inference from the fact that stops were being made like that.

(*Id.*)

The Court finds that the somewhat vague testimony of one or several drivers that they were "instructed" to commit minor technical violations does not, even if true, sustain a legitimate inference that the City's assurances of compliance were intentionally fraudulent within the meaning of the FCA. Lamers asks us to reasonably infer, based on a handful of technical violations committed by individual drivers in a complex busing program, that GBT management consciously orchestrated a campaign to deceive the FTA. The summary judgment standards do not entitle Lamers to the benefit of every inference that could conceivably arise from the evidence, but only to *reasonable* or *justifiable* inferences. *Anderson,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

For such a huge leap from the facts to approach being reasonable, Lamers must at least point to a plausible motive on the part of the City. At oral argument, Lamers suggested only GBT's desire to build public transit ridership. (Oral Arg. Tr. at 39–40.) No financial motives have been alleged, and for the most part the violations involved are not of the cutting-corners-on-the-budget variety. The most plausible explanation for the violations which did occur is that GBT was misguided about tripper requirements and/or was not paying close attention to the rules. Again, innocent mistakes and negligence are not actionable under the FCA. *Hindo,* 65 F.3d at 613.

After poring over the parties' submissions for signs of a factual dispute, this Court agrees with the conclusion of the FTA, which investigated Lamers' complaints identical or similar to those which form the basis for the current lawsuit. The FTA found that GBT was operating impermissible tripper service in some respects but concluded:

[T]he record does not indicate that GBT has ever willfully or intentionally, violated the regulation at any point in time in total disregard to a request from FTA to cease the improper activity. In fact there is nothing in the record to indicate that in those instances where a violation had occurred, that GBT did not take appropriate action to correct any violation upon an appropriate determination by FTA.

.... Therefore, while FTA does acknowledge the history of past disputes over school bus service between the parties it does not believe, based on the facts of this complaint, that it constitutes a continuing pattern of abuse by GBT that warrants an extraordinary remedy at this time.

In the case before me, I do not find the inference that the City acted intentionally to violate transit regulations in order to obtain FTA funds to be a reasonable one. Without such an inference, there is insufficient evidence for any factfinder to conclude that the City knowingly submitted false statements and claims in violation of § 3729(a)(2).

### (d) Post–FTA Decision statements, including the 1995 Standard Assurances

On January 19, 1995, the FTA issued its Decision on Lamers' 1994 official administrative complaint. The Decision relied on materials submitted by Lamers over the course of the previous six months, including a video-

tape of allegedly offending tripper service. The agency discussed a number of issues and technical complaints raised by Lamers, but listed only two significant areas of non-compliance: problems with map design and distribution, and the practice of express tripper runs to points of route deviation. The Decision ordered corrective action in these two areas, and also asked the City to submit a comprehensive tripper service plan for agency approval within thirty days and to continue updating the FTA on any revisions to this plan. Thus, the 1995 Decision set in motion what the agency clearly saw as an interactive, cooperative push toward full compliance involving both the City and the FTA.

After the Decision was issued, Gretzinger and Schmidt–Lehman began to communicate regularly with Carter about compliance efforts, exchanging numerous letters and speaking frequently by phone. Lamers cites Schmidt–Lehman's letter of February 15, 1995, the City's first official response to the agency directives, as the first source of post-Decision "false statements." The detailed letter discusses the three corrective steps required by the FTA.

On the issue of tripper maps, Schmidt–Lehman explained why GBT had felt it impracticable to include all tripper routes on the general system map, enclosing a copy of the failed map design. Schmidt–Lehman also included copies of already-published individual tripper maps (which appeared not to have been provided to the FTA prior to its ruling) and said that GBT would see that the maps were distributed to all service outlets in addition to the transit center.

On the issue of express runs to route deviations and the larger question of GBT bus stop policy, Schmidt–Lehman appears to misunderstand the FTA's criticisms of the express run practice, in that she proposes a dispatching modification which would not really address the agency's chief concern—that express trippers were sailing past designated stops without stopping. On the other hand, she makes the valid point that since GBT policy at the time designated every corner as a potential stop, a videotape showing express runs did not establish a failure to stop unless waiting passengers were disregarded.

Finally, Schmidt–Lehman promised to forward "future revisions" to the FTA, suggesting, perhaps, that she considered the letter itself a response to the third agency order, submission of a detailed tripper plan.

Lamers alleges that Schmidt–Lehman's February 15, 1995, response contained several "false statements." Primarily, Lamers complains that Schmidt–Lehman is still perpetuating GBT's depiction of its tripper routes as "deviations" or "extensions." For reasons discussed earlier in this opinion, the Court does not find that GBT's characterization of trippers as extensions, whether technically inaccurate or not, suggests an underlying violation of regulations or has any bearing on FTA decision-making; therefore, I do not consider these statements "false" within the meaning of the Act. Secondarily, Lamers complains that the tripper maps were not distributed promptly to service outlets as promised and that the letter itself did not satisfy the FTA's request for a complete tripper service plan. While Lamers' criticisms on these two points appear justified, the statements themselves in no way give rise to the inference that Schmidt–Lehman was intentionally lying to the FTA. On the whole and despite some persistent confusion, the letter establishes the City's earnest intent to come into compliance.

A second potential source of post-Decision "false statements" alleged by Lamers is Gretzinger's May 30, 1995 letter to Carter, responding to specific concerns expressed by Carter during his unannounced site visit to Green Bay in April of 1995 and in a follow-up letter. Carter had observed GBT tripper service under the guidance of Lamers official Byron Kruschke and noted certain continuing violations: the persistent unavailability of tripper maps at all service outlets; express runs *between* route deviation points, or a practice called "deadheading;" and mid-block accommodation pick-ups. Lamers cites Gretzinger's response for, again, continuing to describe tripper routes as extensions, and for its alleged duplicity in suggesting that the delay in map distribution was due to GBT awaiting some go-ahead from the FTA before proceeding. The route extension depiction is not a false statement within the meaning of

the Act, as previously noted. Gretzinger's excuse concerning map distribution is at most fudging to cover administrative negligence but does not suggest the level of intentional deceit contemplated by the FCA.

A third potential source of "false statements" for Lamers is a second detailed letter from Schmidt–Lehman, sent June 8, 1995. Approval of the City's 1995 grant application, discussed below, was officialized on the day this letter was sent, so it appears doubtful that any false statements made in the letter could function in support of an underlying claim. In any event, the Court does not find any actionable false statements in the letter. Schmidt–Lehman discussed the recent June 1, 1995, meeting with Carter and Lamers representatives, and described other ongoing compliance efforts, such as map revision, route marker installation, and clarification of bus stop policy. Lamers primarily takes issue with Schmidt–Lehman's assertion that "Green Bay Transit never characterized its tripper service as 'route deviations'." (Def.'s App. Ex. 34 at 2.) This statement was clearly inaccurate, as Schmidt–Lehman later conceded. The error suggests an unfortunate lack of precision and miscommunication between Schmidt–Lehman and Gretzinger, in keeping with GBT's overall confusion about tripper requirements, but is not "false" within the meaning of the Act or relevant to FTA grant consideration or approval.

Because of my analysis of Lamers' reverse false claims in subpart "B" of this decision, I find it unnecessary to discuss any alleged false statements made by the City after the 1995 grant approval, although I note that a review of subsequent correspondence between the City and the FTA does not reveal any actionable false statements and only establishes an ongoing cooperative relationship.

The final set of alleged false statements at issue are the 1995 Standard Assurances submitted by the City in conjunction with that year's application for financial assistance. As noted before, the annual certifications are non-specific assurances of ongoing and future compliance and can be considered "false" only to the extent that the City *knew* GBT was or would be in violation of applicable regulations *at the time* it submitted the grant

application. The regulatory violations alleged to have occurred in the year preceding the 1995 certifications are essentially the same as those discussed in the Court's analysis of the 1994 Standard Assurances. Thus, the analysis and conclusions of the previous section apply with equal force to the 1995 Standard Assurances at issue here.

In addition, the fact that the 1995 application and assurances were submitted and approved in the wake of the FTA Decision and in the midst of continuing, FTA-supervised compliance efforts changes the calculus in assessing knowledge of falsity under the FCA. The record clearly establishes an ongoing, cooperative relationship aimed at compliance between Carter and City officials. The 1995 grant application itself was approved one week after Carter's June 1, 1995, open meeting in Green Bay with both parties to this action. The meeting minutes make clear that the City was still not in full compliance, but that the FTA was willing to continue overseeing compliance efforts. (*See* Def.'s App. Ex. 33 at 2.) Although loss of funding was held out as a potential sanction for persistent violations, no cut-off date or precise timetable towards complete compliance was established. With the City's 1995 grant approval coming but one week later, on June 8, 1995, the record appears incontrovertible that the FTA extended money to the City with full knowledge of GBT's nagging technical violations. The FTA's faith that total compliance would eventually be achieved under the agency's supervision appears to have been rewarded. GBT compliance efforts continued over the course of the next year and in conjunction with the City's triennial review of all federally funded transit programs. On September 19, 1996, the FTA informed GBT that it was in complete compliance with the school bus operations regulations and the requirements of the 1995 FTA Decision.

In general, Lamers response to the overwhelming evidence of FTA–City cooperation is that the City's posture of self-improvement and willing compliance was a ruse. Lamers asserts that the City did not notify drivers of the content of the FTA Decision, betraying its lack of commitment to real change. But

the record contains a January 31, 1995, memo from GBT management to all transit drivers which states, in part: "..."Tripper" routes are OPEN TO THE PUBLIC and makes stops at EVERY INTERSECTION AND BUS STOP FOR WAITING PASSENGERS...NO ONE IS TO BE PASSED BY BECAUSE YOU ARE OPERATING A "TRIPPER" ROUTE." (Pl.'s App. Ex. 26.) The memo itself covers the substance of any FTA instructions directed at tripper route drivers; other compliance actions were the province of GBT management and were enacted gradually over the course of the next year.

Lamers also rebuts the weight of the government knowledge defense by arguing that the FTA did not really know all the relevant facts when its Decision was issued in January of 1995. Lamers' counsel even goes so far as to assert that "the earliest that arguably the FTA started to comprehend the facts was in late, very late '95." (Oral Arg. Tr. at 58.) Lamers further suggests that had the FTA been aware of evidence unearthed during discovery for this case, the 1995 Decision and grant approval would have been impacted.

First, contrary to these assertions, the 1995 Decision, which relied almost entirely on evidence submitted by the plaintiff, confronts the bulk of Lamers' complaints against the City. Subsequent evidence obtained by Lamers, such as the deposition testimony of GBT bus drivers described in the previous section, does little more than suggest minor, technical violations and is unlikely to have affected FTA conclusions about GBT tripper service. Carter, himself, who certainly became aware of details about GBT tripper service and additional violations over ensuing months, testified in deposition that the FTA Decision remains an accurate statement of the agency's assessment of GBT culpability. (Carter Dep. at 139–140.)

Second, the government knowledge defense as such does not hinge on the FTA's knowledge at the time of the Decision but also gains credence from government cooperation with the City throughout the following year, as GBT made efforts to comply. In fact, the rationale behind the defense makes the most sense in the context of a continuing dialogue such as the one between the FTA and the City. Despite its awareness of tripper violations and its authority to withhold funding, the FTA judged the City worthy of transit assistance. FTA Administrator Gordon Linton has stated with respect to the City's transit program that he does not believe that "isolated, accidental, singular incidents or technical violations justify the termination of financial assistance, especially when the recipient is making good faith efforts to comply with the regulation." (Def.'s App. Ex. 46 at 2.) Given the open channels of communication between GBT and Carter, and the FTA's evident knowledge that City compliance was far from perfect, the Court finds that Lamers cannot establish the requisite element of knowledge of falsity in order to sustain an FCA claim based on the 1995 grant applications and assurances.

Lamers continues to assert that the wool is being pulled over the FTA's eyes, that even now the agency does not appreciate the gravity of the City's conduct in this action. The Court does not find any hidden truth in the record that permits the justifiable inference that the agency is being led astray. Carter has stated that he is still not aware of any facts which would lead him to believe anyone from the City intentionally lied to him about GBT tripper routes. (Carter Dep. at 155.) While the FCA's *qui tam* framework encourages private litigants to prod the government into action to a certain extent, the government knowledge defense and the Act's own provision for government intervention suggest that at some point this rationale breaks down. The FCA does not intend relators such as Lamers to function as ongoing monitors of the government's investigatory acumen. If the FTA believes it was not deceived, the Court is inclined to believe it.

Based on the foregoing analysis the defendant's motion for summary judgment on Lamers' claim under § 3729(a)(2) is granted.

### B. *Count II—Lamers' Claims Under § 3729(a)(7)*

Count II of Lamers' amended complaint relies on § 3729(a)(7) of the FCA, which attaches liability to any person who "knowingly makes, uses, or causes to be made or

used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." A cause of action under this provision requires proof of both falsity and scienter as discussed above in connection with Lamers' claims under § 3729(a)(2). Since the statements and claims alleged to violate subparagraph (a)(7) are identical to those undergirding the (a)(2) claims, Lamers claims under § 3729(a)(7) fail to survive summary judgment based on the above analysis and conclusions with respect to the falsity and scienter elements.

Additionally, this so-called "reverse false claims" provision alters the requirements of proof for the first element discussed under the (a)(2) claims above. Specifically, subparagraph (a)(7) requires proof that statements were made in order to "conceal, avoid, or decrease an obligation to pay." Litigation in district courts under § 3729(a)(7) has become more frequent, the primary point of contention being the parameters of "obligation," which the FCA does not define. Construing "obligation" broadly, several courts have imposed FCA liability for failure to report environmental and regulatory violations in order to avoid potential fines or sanctions. *See, e.g., Pickens v. Kanawha River Towing,* 916 F.Supp. 702, 708–09 (S.D.Ohio 1996).

Tackling this issue, the Eighth Circuit has recently held that a mere *potential* liability for fines and sanctions, to be imposed at some point down the road, is not an "obligation to pay" such as contemplated by the statute. *U.S. v. Q International Courier, Inc.,* 131 F.3d 770, 773 (8th Cir.1997). The court there stated:

> To recover under the False Claims Act, we believe that the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used. The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness.

*U.S. v. Q International Courier, Inc.,* 131 F.3d 770, 773 (8th Cir.1997). The Eighth Circuit supports its interpretation of "obligation" by citing legislative history behind the reverse false claims concept. *See* S.Rep. No.99–345, at 15,18 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5280, 5283 (referring twice to "money owed" in the indicative past tense).

■■■ Without endorsing the Eighth Circuit's conclusion that an obligation within the meaning of the FCA "must be for a fixed sum that is immediately due," *International Courier,* 131 F.3d at 774, I find the reasoning underlying the decision to be persuasive. Accordingly, this Court holds that the FCA's reverse false claims provision has in mind an obligation to pay which is at least as immediate and recognizable as affirmative claims for payment under the statute.

■■■ Based on this understanding of "obligation" under § 3729(a)(7), Lamers fails to establish the first required element: that statements were made to escape such an obligation to pay. Lamers argues that the City continued to make false representations to protect itself from the possibility that the FTA, once conscious of the truth, would demand reimbursement of grant monies forwarded in 1993, 1994, and 1995. To bolster this argument, Lamers cites deposition testimony from Carter, stating that the City was informed in June of 1995 that a continuing, willful violation of transit regulations constituted a breach of the City's grant agreement with the FTA and "could result in the suspension of funding under existing grants.... and possibly the reimbursement of funding under previous grants." (Carter Dep. at 76–77.) The FTA Decision itself did not threaten reimbursement but spoke only of "barring GBT from the future receipt of FTA funds" as a possible sanction for continued failure to comply. (Def.'s App. Ex. 29 at 6.) Although the City conceded at oral argument that the FTA had the theoretical power to order a refund of already-disbursed grant money, citing 49 U.S.C. § 5307(i)(3), the Court is not convinced the applicable statutes and regulations permit such an extreme

sanction absent a civil judgment.[12] (Oral Arg. Tr. at 9.)

In any event and despite Carter's admonitions, the prospect that the FTA would order the City to refund grant money already used for public transit operations seems remote at best. The posture of the FTA throughout these events has been non-punitive, accommodating, and clearly willing to continue financial assistance during a period of gradual compliance efforts. Because Lamers cannot credibly argue that the City had or now has an immediate, recognizable obligation to repay the FTA for transit funds received in 1993, 1994, and 1995, Lamers claims under § 3729(a)(7) are not actionable.

Based upon the foregoing analysis, the defendant's motion for summary judgment on Lamers' claim under § 3729(a)(7) is also granted. Therefore, it is ordered that the defendant's motion for summary judgment is granted in its entirety and the clerk shall enter judgment accordingly.

12. Section 605.34 of the school bus operations regulations expressly permits the FTA Administrator only to bar a grantee from the receipt of further financial assistance for violating regulations. Title 49 U.S.C. § 5307(i)(3) permits the Secretary of Transportation to take appropriate remedial action in the context of an annual or triennial review, including "making an appropriate adjustment in the amount of a grant or withdrawing the grant." That "withdrawing the grant" in the context of an annual or triennial review encompasses ordering the refund of grants issued in the previous or past years is not clear to the Court.